1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11
12
13

CHRISTOPHER LORENZO, suing individually and on behalf of all others similarly situated,

Plaintiff,

vs.

14
15

QUALCOMM INCORPORATED, a Delaware corporation,

Defendant.

CASE NO. 08cv2124 WQH (POR)

**ORDER**

16

HAYES, Judge:

17
18

The matter before the Court is the Motion to Dismiss Plaintiff's Complaint (Doc. # 14) filed by Defendant Qualcomm Incorporated.

19

## **Factual Allegations in the Complaint**

20

A.       The Parties

21
22
23
24
25
26
27
28

On November 18, 2008, Plaintiff Christopher Lorenzo initiated this action by filing the Complaint (Doc. # 1).  Plaintiff is a resident of Los Angeles County, CA.  *Complaint,* ¶ 9. Plaintiff purchased a Palm Treo 700Wx and a Blackberry Curve from Verizon and receives cellular service from Verizon.  *Id.,* ¶ 10.  Defendant Qualcomm Incorporated ("Qualcomm") is a Delaware corporation with its principal place of business in San Diego, CA.  *Id.,* ¶ 11. Qualcomm "is the second-biggest maker of mobile-phone chips and holds more than 1,400 patents which it licenses to more than 130 companies, including chip makers and cell phone manufacturers."  *Id.*

B.   The Wireless Industry

Cell phones today "principally use one of two leading wireless technologies: either the Global System for Mobility ('GSM') or the Code Division Multiple Access ('CDMA')." *Id.,* ¶ 12. These GSM and CDMA systems "have unique features and technology, thus neither the systems, nor the phones used for each system are interchangeable or substitutes - a GSM phone will not work on a CDMA network and vice versa." *Id.* The "chipsets that operate cell phones must conform to the technology for the system for which the phone is being manufactured." *Id.,* ¶ 13. As the technologies evolve, they are referred to by "generations." *Id.* The GSM and CDMA pathways evolve independently. *Id.*

C.   Qualcomm's Patents and Licensing Practices

"Qualcomm holds certain patents that it asserts are 'essential' to the CDMA technology and standard and, according to Qualcomm, the CDMA standard cannot be practiced without using Qualcomm technology based on its patents." *Id.,* ¶ 15. Standard setting organizations ("SDO's") adopted CDMA as a standard technology for a new generation of phones such that "any company that wanted to produce a CDMA compliant product had to pay licensing fees to Qualcomm for use of its CDMA intellectual property rights." *Id.,* ¶ 29.

> By virtue of its patents of certain CDMA intellectual property rights and incorporation and adoption by CDMA standards rendering such patents 'essential' to the manufacture of CDMA-complaint devices, Qualcomm had and continues to exercise market and monopoly power in the relevant CDMA patent technology market - a market separate and distinct from the CDMA-chipset market. . . .
>
> Qualcomm has used that power over CDMA technology to obtain and protect monopoly power in the CDMA chipset market.

*Id.,* ¶¶ 30-31.

"In at least some manufacturer licenses, Qualcomm substantially reduces royalty rates when a licensee agrees to purchase Qualcomm chipsets exclusively." *Id.,* ¶ 31. For example, Qualcomm's "patent licensing agreements with Chinese cell phone manufacturers are expressly discriminatory and explicitly linked to those manufacturers' use of Qualcomm chipsets." *Id.* Qualcomm has "publicly summarized" that the royalty rates provided to certain Chinese manufacturers "are more favorable than our standard rates," partly because these

manufacturers agree to use Qualcomm's chipsets. *Id.,* ¶ 32. Qualcomm's "royalty rate discrimination furthers no legitimate competitive interest or business need," but rather "is intended to harm, and has the effect of harming, competition in the CDMA chipset market and the CDMA device market." *Id.,* ¶ 33. Qualcomm's royalty rate discrimination also violates Qualcomm's commitments to the SDOs to license its CDMA intellectual property rights on fair, reasonable, and non-discriminatory ("FRAND") terms. *Id.,* ¶ 35.

Qualcomm collects double royalties through insisting "on licenses at both the component and the cell phone level." *Id.,* ¶ 39.

> CDMA cell phone manufacturers pay a royalty to Qualcomm for rights including the right to make (or to have made) and use CDMA chipset[s] in CDMA-complaint cell phones to be sold by the licensee. Cell phone manufacturer licensees pay the same royalty rate per handset regardless of whether they make (or have made) their own customized CDMA chipsets or buy from a CDMA chipset manufacturer that is licensed by Qualcomm. Thus, when a CDMA chipset cell phone manufacturer buys a CDMA chipset from a Qualcomm licensee, both the handset manufacturer and the chipset manufacturer are paying a royalty to Qualcomm for the right to make the chipset.

*Id.,* ¶ 41. This "royalty rate scheme enables [Qualcomm] inappropriately to charge twice for the same intellectual property right." *Id.,* ¶ 40. Qualcomm's efforts to collect double royalties compels "each customer to negotiate with Qualcomm for a separate license, even if that customer wants to purchase chipsets from a source other than Qualcomm;" violates Qualcomm's commitments to license its CDMA intellectual property rights on FRAND terms; and violates the "patent exhaustion doctrine by collecting and requiring CDMA component and handset manufacturers to pay twice for the same license." *Id.,* ¶¶ 42-44.

"Qualcomm has protected its interests through non-disclosure agreements that prohibit parties to its CDMA licensing agreements from disclosing confidential information, including its discriminatory royalty rate pricing structure." *Id.,* ¶ 45. Qualcomm's "secret allowance of . . . unearned discounts is for the purpose of, and had the effect of, injuring and eliminating competition in the CDMA chipset market." *Id.,* ¶ 47.

///

///

///

D.      Harm to Plaintiff

Plaintiff is an end consumer of the CDMA chipset market. . . .

Plaintiff has suffered harm from Qualcomm's anticompetitive CDMA licensing practices. CDMA chipset manufacturers suffer direct anticompetitive harm from Qualcomm's CDMA licensing practices. This anticompetitive harm includes supracompetitive prices and impaired non-price competition in innovation of CDMA functionality. . . . CDMA chipset manufacturers pass CDMA licensing costs down to CDMA device manufacturers, CDMA device manufacturers pass those costs down to their vendors, and the vendors ultimately pass those costs on to end consumers, such as Plaintiff.

*Id.,* ¶¶ 23-24.

E.      Claims for Relief

Claim I: Violation of California's Cartwright Act, section 16720, *et seq.,* of the California Business and Professions Code

Qualcomm and its licensees "formed a combination of capital, skill and/or acts by two or more persons for the purpose of creating restrictions and preventing competition in manufacturing, making, sale and/or purchase of CDMA chipsets and devices containing such chipsets." *Id.,* ¶ 67. Qualcomm's "CDMA licensing practices constitute a trust in violation of the Cartwright Act, even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made and Qualcomm created a trust by simply reneging on its commitment to FRAND licensing for the CDMA patents and engaging in the discriminatory and exclusive licensing practices alleged herein." *Id.,* ¶ 68. Qualcomm's CDMA licensing practices "have caused antitrust injury . . . and threaten additional antitrust injury if [] allowed to continue" in the form of supracompetitive prices and impaired non-price competition in the form of deterred innovation. Qualcomm's conduct constitutes a combination in restraint of trade.

Qualcomm also "has required and coerced through discriminatory royalty rates that anyone who wants favorable royalty rates on its CDMA patent technology . . . to also agree to exclusively purchase Qualcomm's CDMA chipsets." *Id.,* ¶ 75. "The effect of Qualcomm's discriminatory pricing and tying arrangements had been to substantially harm competition in the market for CDMA chipsets." *Id.,* ¶ 78. Plaintiff and the class "have suffered antitrust injury as downstream indirect purchasers who paid supracompetitive prices for CDMA-

complaint devices and/or cellular service as a result of Qualcomm's licensing practices." *Id.,* ¶ 80.   Qualcomm's conduct constitutes discriminatory pricing and tying.

Claim II: Violation of California's Unfair Practices Act, section 17000, *et seq.,* of the California Business and Professions Code

"Qualcomm's licensing practices, coupled with corresponding non-disclosure provisions . . . constitute the secret payment or allowance of rebates, refunds, commissions, or unearned discounts." *Id.,* ¶ 82.  "The payment or allowance of such discriminatory and secret royalty rates conditioned on exclusive dealing provisions and agreements not to purchase CDMA-chipset[s] from other competitor suppliers has a tendency to destroy competition." *Id.,* ¶ 84.  Plaintiff and the class "have suffered antitrust injury as downstream indirect purchasers who paid supracompetitive prices for CDMA-complaint devices and/or cellular service as a result of Qualcomm's licensing practices." *Id.,* ¶ 85.

Claim III: Violation of California's Unfair Competition Law, section 17200, *et seq.,* of the California Business and Professions Code

Qualcomm's CDMA licensing practices are "unlawful, unfair, and deceptive practices." *Id.,* ¶ 87.  Qualcomm's licensing practices "are unfair or deceptive business acts or practices because even if Qualcomm's commitment to FRAND licensing was not intentionally false at the time it was made, Qualcomm committed an unfair or deceptive business act or practice by simply reneging on its commitment to FRAND licensing and offering on a discriminatory basis its licenses for the CDMA patents." *Id.,* ¶ 88.  Qualcomm's conduct constitutes an unlawful business practice because it "violates federal, state, statutory, regulatory, or common law," and is "unethical, unscrupulous, and substantially injurious to consumers." *Id.,* ¶¶ 89-90.  Qualcomm's conduct constitutes a fraudulent business practice because Qualcomm's "conduct was likely to mislead Plaintiff and all others similarly situated by deceiving and leading customers to believe, among other things, that the additional amounts paid by consumer for CDMA-compliant cellular devices and/or cellular services were warranted and appropriate." *Id.,* ¶ 91.

Claim IV: Equitable and Injunctive Relief pursuant to Section 16 of the Clayton Act

Qualcomm's anticompetitive conduct has "caused artificially high prices for CDMA-compliant devices" and for "cellular services purchased by consumers who buy from carriers which bundle their cellular service with subsidized CDMA-capable devices." *Id.,* ¶ 95.

Claim V: Common Law Monopoly

Qualcomm "willfully engaged in predatory and anticompetitive conduct intentionally to obtain monopoly power in the relevant market in violation of common law." *Id.,* ¶ 98. Qualcomm has acted "with a specific intent to monopolize the CDMA-chipset market" and has illegally attempted "to monopolize in violation of California common law" through requiring "discriminatory and exclusive licensing agreements." *Id.,* ¶¶ 102-103.  Plaintiff and the putative class have suffered injury as a result of Qualcomm's monopoly power and anticompetitive conduct "because they have been, and continue to be, forced to purchase CDMA-complaint devices at a price that is higher because of Qualcomm's royalty, because of the lack of competition in the CDMA-chipset market as a result of Qualcomm's licensing practices, or because the CDMA-chipset market has in otehr ways been harmed by Qualcomm's conduct." *Id.,* ¶ 103.

VI:     Unjust Enrichment

Qualcomm "intentionally offered its CDMA intellectual property rights on a discriminatory and exclusionary basis in order to obtain and maintain an unjust, anticompetitive advantage." *Id.,* ¶ 108. Qualcomm "unjustly obtained a significant benefit as a result of this anticompetitive conduct, including but not limited to, the retention of licensing fees and royalties." *Id.,* ¶ 109.

**Procedural History**

On January 12, 2009, Qualcomm filed the Motion to Dismiss.  On February 2, 2009, Plaintiff filed the Response in Opposition to the Motion to Dismiss (Doc. # 15).  On February 23, 2009, Qualcomm filed the Reply (Doc. # 16).

1

**Standard of Review**

2          A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests

3    the legal sufficiency of the pleadings.  *See De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir.

4    1978).  A complaint may be dismissed for failure to state a claim under Rule 12(b)(6) where

5    the factual allegations do not raise the right to relief above the speculative level.  *See Bell*

6    *Atlantic v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Conversely, a complaint may not be

7    dismissed for failure to state a claim where the allegations plausibly show that the pleader is

8    entitled to relief.  *See id.* (citing Fed R. Civ. P. 8(a)(2)).  In ruling on a motion pursuant to Rule

9    12(b)(6), a court must construe the pleadings in the light most favorable to the plaintiff, and

10   must accept as true all material allegations in the complaint, as well as any reasonable

11   inferences to be drawn therefrom.  *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003);

12   *see also Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996).

13          The allegations in the complaint "may not evade [antitrust] requirements by merely

14   alleging a bare legal conclusion."  *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729,

15   736 (9th Cir. 1987). "[A] district court must retain the power to insist upon some specificity

16   in pleading before allowing a potentially massive factual controversy to proceed," especially

17   in light of the fact that "antitrust discovery can be expensive."  *Twombly,* 550 U.S. at 544.

18   Plaintiffs alleging antitrust claims must set forth enough "factual matter" to "nudge[] their

19   claims across the line from conceivable to plausible."  *Id.*  California courts similarly demand

20   a "high degree of particularity in the pleading of Cartwright Act violations."  *G.H.I.I. v. MTS,*

21   *Inc.,* 147 Cal. All. 3d 256, 265 (1983); *see also Cellular Plus, Inc. v. Superior Court,* 14 Cal.

22   App. 4th 1224, 1236 (1993).

23

**Analysis**

24   **I.     Standing under the Clayton Act and the Cartwright Act**

25          Qualcomm asserts that antitrust standing is a threshold requirement that every plaintiff

26   must satisfy to bring a private suit under the federal and state antitrust statutes.  Qualcomm

27   asserts that Plaintiff has failed to satisfy this threshold requirement with respect to Plaintiff's

28   claim under both the Clayton Act and the Cartwright Act because "Plaintiff effectively

concedes that his purchase is too remote from the alleged anticompetitive conduct," and because Plaintiff has not suffered harm in the "markets for technology and chipsets in which the alleged anticompetitive conduct occurred." *Mot. to Dismiss,* p. 1-2.

Qualcomm contends that for a plaintiff to have antitrust standing, an "injury cannot be secondary, consequential, or remote, but must be the direct result of the unlawful conduct." *Id.* at 7-8 (internal quotations omitted). Qualcomm contends that "Plaintiff . . . positions his alleged injury at least three levels removed from any alleged misconduct by Qualcomm," and that Qualcomm's licensed technology "is not an identifiable, discrete physical product that is simply resold to consumers and that can be traced through one level of distribution." *Id.* at 8-9. Qualcomm contends that Plaintiff's injury is too remote to support standing. Qualcomm further contends that the "putative class consists of end consumers in the market for cell phones or cellular service." *Id.* at 10. Qualcomm contends that "Qualcomm is not alleged to supply cell phones or cellular service or otherwise to participate in either of these markets. Instead, the only alleged wrongdoing is in connection with Qualcomm's CDMA licensing, which allegedly occurs in two different markets, namely the alleged CDMA patent technology market and the alleged CDMA chipset market." *Id.* (internal quotations omitted). Qualcomm contends that Plaintiff has failed to allege antitrust injury because Plaintiff fails to allege that he or the class that he purports to represent is a participant in the market where the alleged antitrust violations took place.

Plaintiff agrees with Qualcomm that antitrust standing is a threshold requirement to bringing a private action under the federal and state antitrust laws, and asserts that he has satisfied the threshold requirement of adequately alleging antitrust standing with respect to his fourth claim brought under the Clayton Act and first claim brought under the Cartwright Act. Plaintiff contends that he need not be a direct consumer or competitor to bring these claims because indirect purchasers have standing to bring an injunctive antitrust claim under both the federal and state antitrust laws. Plaintiff contends that difficulties in tracing "overcharges for components through a distribution chain" does not preclude standing. *Opposition,* p. 4. Plaintiff contends that "as a direct and foreseeable result of Qualcomm's anticompetitive

licensing practices, Plaintiff and other consumers were forced to pay more for their CDMA-capable cellular handset devices than they would have otherwise paid." *Id.* at 7.  Plaintiff contends that "Plaintiff suffered an antitrust injury even though he was not a participant in the CDMA patent technology market or the CDMA chipset market" because "the impact on the prices of cellular handsets paid for by the ultimate consumers is clearly foreseeable" and "injury in the form of higher prices to consumers is within the type of injury that the antitrust laws are designed to prevent." *Id.* at 8.

A.   Standing under the Clayton Act

"Antitrust standing" is a threshold requirement that every plaintiff must satisfy to bring a private suit under the federal antitrust laws. *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 264 (3d Cir. 1998).  Antitrust standing is distinct from Article III standing.  "A plaintiff who satisfies the constitutional requirement of injury in fact is not necessarily a proper party to bring a private antitrust action." *Associated General Contractors of California, Inc. ("AGC") v. California State Council of Carpenters,* 459 U.S. 519, 535, n. 31 (1983).

In order to have standing to seek injunctive relief under section 16 of the Clayton Act,[1] a private plaintiff must allege that the plaintiff has "suffered loss or damage of a type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113 (1986) (internal quotations omitted); *see also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476 (1982) (antitrust standing requires an "analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of 'proximate cause'").  "[I]t is not the status as consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff." *American Ad Management, Inc. v. General Telephone Company of California,* 190 F.3d 1051, 1057 (9th Cir. 1999); *In re Warfarin Sodium Antitrust Litigation,* 215 F.3d 395, 400 (3d Cir. 2000) (status as

---

[1] The Clayton Act "provides a vehicle for private enforcement of the [Sherman Act]." *Cargill, Inc.,* 479 U.S. at 109.  Under section 16 of the Clayton Act, "[any] person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws." *Id.*

an "indirect purchaser" is not "fatal to a plaintiff's request for injunctive relief under section 16" of the Clayton Act). However, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268-69 (1992).

In order to have antitrust standing, the plaintiff must "have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *American Ad Management,* 190 F.3d at 1057*; In re Warfarin,* 215 F.3d at 400 ("it is not the status as consumer or competitor that confers antitrust standing, but the relationship between the defendant's alleged unlawful conduct and the resulting harm to the plaintiff"). A "narrow exception" exists to this "market participant" requirement "for parties whose injuries are 'inextricably intertwined' with the injuries of market participants" or with "the injury the conspirators sought to inflict." *American Ad Management,* 190 F.3d at 1057 (citing *McCready,* 457 U.S. 465). This exception applies when the claimant can be considered the "direct victim" of a conspiracy or the "necessary means" by which the conspiracy was carried out. *Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 744-47 (9th Cir. 1984) (citing *McCready,* 457 U.S. at 479). "[T]he simple invocation of [the phrase 'inextricably intertwined'] . . . will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered any injury of the type - almost exclusively suffered by competitors - that the antitrust laws were intended to prevent." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 926, n.8 (3d Cir. 1999).

The conduct that is at the center of the Complaint is Qualcomm's alleged anticompetitive CDMA licensing practices. The Complaint alleges that Qualcomm holds "certain" patents that it asserts are essential to the CDMA standard. *Complaint,* ¶ 15. The Complaint alleges that Qualcomm's licensing practices cause direct anticompetitive harm to CDMA chipset manufacturers in the form of supracompetitive prices and impaired non-price competition in innovation of CDMA functionality. The Complaint alleges that "CDMA

1   chipset manufacturers pass CDMA licensing costs down to CDMA device manufacturers,

2   CDMA device manufacturers pass those costs down to their vendors, and the vendors

3   ultimately pass those costs on to end consumers, such as Plaintiff." *Id.,* ¶ 24.

4   Plaintiff brings this action as an indirect purchaser, on grounds that Qualcomm's

5   licensing practices indirectly caused Plaintiff to pay supracompetitive prices for his cell phone

6   and cellular service. As alleged in the Complaint, Plaintiff's end-consumer injury is traced

7   through three levels of the supply chain - chipset manufacturers, device manufactures, and

8   vendors. Furthermore, the technology licensed by Qualcomm to chipset manufacturers is only

9   a component of the technology ultimately creates a chipset, which is then passed on through

10  the supply chain such that Plaintiff's injury also must be disaggregated from a multitude of

11  other manufacturing and component factors. Although Plaintiff's indirect purchaser status

12  alone does not preclude antitrust standing, the Court concludes that Plaintiff's injury as alleged

13  in the Complaint is too remote from Qualcomm's alleged antitrust violations to support

14  standing under the Clayton Act.

15  The Complaint alleges that Qualcomm's unlawful licensing practices occurred in the

16  market for CDMA-related patents and technology, and that Plaintiff is an end consumer who

17  suffered injury in the form of anticompetitive prices in the market for cell phones and cellular

18  service. The Court concludes that the Complaint fails to allege sufficient facts to support a

19  finding that Plaintiff is a participant in the market where Qualcomm's unlawful conduct

20  allegedly occurred. *See American Ad Management,* 190 F.3d at 1057. The Complaint does

21  not allege facts to support a finding that Plaintiff and Qualcomm had a direct relationship, that

22  Qualcomm's anticompetitive conduct proximately caused Plaintiff's injury, that Plaintiff is a

23  direct victim of Qualcomm's anticompetitive conduct, or that Plaintiff is the "necessary

24  means" by which Qualcomm carried out its anticompetitive licensing scheme. *See Ostrofe,*

25  740 F.2d at 755. The Court concludes that the Complaint fails to allege sufficient facts to

26  support a finding that Plaintiff's alleged injury is inextricably intertwined with Qualcomm's

27  unlawful conduct so as to fit within the "narrow exception" to the market participant

28  requirement. *American Ad Management,* 190 F.3d at 1057

The Court concludes that the Complaint fails to allege the type of injury that the "antitrust laws were designed to prevent" and that "flows" from the conduct that makes defendants' acts unlawful. *Cargill,* 479 U.S. at 113. The Court dismisses the Complaint's fourth claim for equitable and injunctive relief pursuant to section 16 of the Clayton Act on grounds that Plaintiff lacks standing.

B.    Standing under the Cartwright Act

The Cartwright Act "is California's version of the federal Sherman Act and sets forth California's antitrust laws." *Cellular Plus, Inc. v. Superior Court of San Diego County,* 14 Cal. App. 4th 1224, 1232 (1993). In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful." *Id.* at 1234. The Cartwright Act "is patterned after the federal Sherman Anti-Trust Act . . . , so that decisions under the latter act are applicable to the former." *Kolling v. Dow Jones & Company, Inc.,* 137 Cal. App. 3d 709, 717 (1982). However, standing under California's Cartwright Act is broader than standing under the Sherman Act insofar as the Cartwright Act explicitly permits indirect purchasers to bring suits for damages and injunctive relief, whereas an indirect purchaser may only bring suit for injunctive relief under the Sherman Act. *Cellular Plus,* 14 Cal. App. 4th at 1234. The California courts have held that a plaintiff whose injuries "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent" has antitrust standing. *Id.* at 1233 (citing *Kolling,* 137 Cal. App. 3d at 724) ("Plaintiff's injuries were not 'secondary' or 'consequential,' since they did not result from injury to third parties; they were not 'remote,' for they were the direct result of the allegedly illegal conduct."). Although the Cartwright Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers," *Cellular Plus,* 14 Cal. App. 4th at 1233, "courts interpreting the Cartwright Act's antitrust standing requirement have consistently followed the 'market participant' rule." *In re Napster, Inc. Copyright Litig.,* 354 F. Supp. 2d 1113, 1125-26 (N.D. Cal. 2005) (citing *MGM Studios, Inc. v. Grokster, Ltd.,* 269 F. Supp. 2d 1213, 1224 (C.D. Cal.

2003).  The plaintiff "must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions."  *Kolling,* 137 Cal. App. 3d at 724; *see also Vinci v. Waste Management, Inc.,* 36 Cal. App. 4th 1811, 1816 (1995) (plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

Plaintiff's status as an end-user, who purchased indirectly from Qualcomm, is not fatal to Plaintiff's standing.  However, Plaintiff must allege an injury that is not "secondary, consequential, or remote" in order to have standing under the Cartwright Act.  *Cellular Plus,* 14 Cal. App. 4th at 1233.  As alleged in this Complaint, there are at least three intermediaries - CDMA chipset manufacturers, CDMA device manufacturers, and CDMA device vendors - between Plaintiff's injury and the alleged antitrust violations, and Qualcomm holds only "certain" patents essential to CDMA, such that each device allegedly containing Qualcomm technology also contains other technology which impacts the final price actually paid by Plaintiff.  *Complaint,* ¶ 33.  The remote nature of Plaintiff's injuries in relation to the alleged antitrust violations is further demonstrated through the allegations in the Complaint that Plaintiff's alleged injuries (payment of inflated prices in the market for cell phones and cellular service) occurred in  separate market from the alleged antitrust violation (the market for CDMA patents and technology).  The Court concludes that Plaintiff's injuries as alleged in the Complaint are too remote to support standing under the Cartwright Act because Plaintiff's injuries occurred in a different market from the allegedly anticompetitive conduct, Plaintiff's injuries are separated by at least three intermediaries to the antitrust violation, and Plaintiff's injuries were not the direct result of Qualcomm's allegedly unlawful conduct.

The Court concludes the Complaint fails to allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts unlawful."  *Cellular Plus,* 24 Cal. App. 4th at 1234.   The Court dismisses the Complaint's first claim for violation of the Cartwright Act on grounds that Plaintiff lacks standing.

///

///

///

1  **II.      Standing under California's Unfair Competition Law**

2          Qualcomm contends that Plaintiff lacks standing to pursue a claim under the

3  California's Unfair Competition Law ("UCL"), stating that "[f]or the same reasons that

4  Plaintiff's injury is too remote to support antitrust standing, he also lacks standing to prosecute

5  a claim under California's UCL." *Mot. to Dismiss,* p. 12.  Qualcomm contends that Plaintiff

6  has failed to allege proximate cause, which is fatal to his UCL claim which requires that the

7  plaintiff suffer injury in fact and have lost money or property as a result of such unfair

8  competition.

9          Plaintiff contends that the Complaint alleges that Plaintiff was injured when he

10  purchased his Palm Treo 700Wx and his Blackberry Curve in an anticompetitive market.

11  Plaintiff contends that "Qualcomm unlawfully obtained profits from monies in which the

12  Plaintiff and the putative class have a vested interest," which is sufficient to support standing

13  under California's UCL.  *Opposition,* p. 10.

14          California's UCL permits civil recovery for "any unlawful, unfair or fraudulent business

15  act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof.

16  Code § 17200.  "A private person . . . has standing to assert a UCL claim only if he or she (1)

17  'has suffered injury in fact,' and (2) 'has lost money or property as a result of the unfair

18  competition.'" *Hall v. Time, Inc.,* 158 Cal. App. 4th 847, 852 (2008) (quoting Cal. Bus. & Prof.

19  Code § 17204).  The second prong of this standing test "imposes a causation requirement.  The

20  phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing

21  of a causal connection or reliance on the alleged misrepresentation."  *Hall,* 158 Cal. App. 4th

22  at 855 ("We use the word 'causation' to refer both to the causation element of a negligence

23  cause of action . . . and to the justifiable reliance element of a fraud cause of action.").

24          In *Hall,* the plaintiff alleged that defendant Time, Inc. offered customers a free preview

25  period during which customers could review a book and return it to Time, Inc. with no

26  obligation to buy, and that Time, Inc. engaged in unfair competition by sending the customer

27  an invoice before the end of the free trial period in order to induce the customer to immediately

28  send payment for the book.  *Hall,* 158 Cal. App. 4th at 850, 857.  The court held that the

plaintiff lacked standing under California's UCL because he "did not allege he did not want the book or Time's alleged acts or unfair competition induced him to keep a book he otherwise would have returned during the free trial period." *Id.* at 857; *see also Laster v. T-Mobile USA, Inc.,* 407 F. Supp. 2d 1181, 1183 (S.D. Cal. 2005) ("Plaintiffs, however, do not include *any* allegations in their [first amended complaint] that they relied on Defendants' advertisements in entering into the transactions. . . . [N]one of the named Plaintiffs allege that they saw, read, or in any way relied on the advertisements; nor do they allege that they entered into the transaction *as a result* of those advertisements.").

The Complaint in this case alleges that Qualcomm made misrepresentations to SDOs, which relied on Qualcomm's misrepresentations in incorporating Qualcomm's technology into the UMTS standard. The Complaint alleges that Plaintiff purchased a Palm Treo 700Wx and and Blackberry Curve from Verizon, and receives cellular phone service from Verizon. Although the Complaint alleges that SDOs relied on Qualcomm's misrepresentations when formulating the UMTS standard, the Complaint does not allege that Plaintiff relied on representations made by Qualcomm when he purchased his cell phone or when he selected his cellular service. The Complaint does not allege that Plaintiff would not have purchased the Palm Treo 700Wx or the Blackberry Curve from Verizon, or would not have chosen to receive cellular phone service from Verizon had Plaintiff been aware of Qualcomm's misrepresentations. The Court concludes that Plaintiff has failed to satisfy the second prong of the test for standing under the UCL because the Complaint does not allege that Plaintiff relied on any misrepresentation made by Qualcomm. *See Hall,* 158 Cal. App. 4th at 855. The Court dismisses the third claim for violation of California's Unfair Competition Law on grounds that Plaintiff lacks standing.

## III. Claim for Violation of the California's Unfair Practices Act

Qualcomm contends that "secret" is a term of art under California's Unfair Practices Act ("California's UPA") "referring specifically to conduct in which a supplier tells purchasers that they are receiving like prices while 'secretly' extending discounts to certain favored purchasers." *Reply,* p. 9. Qualcomm contends "despite claiming that Qualcomm's royalty

discounts are 'secret', Plaintiff recites the relevant terms of the discount and includes Qualcomm's public announcement of its terms with the Chinese device manufacturers." *Mot. to Dismiss,* p. 22 (internal quotations omitted).  Qualcomm further asserts that "Plaintiff makes no attempt to explain how the alleged discounts were somehow 'unearned,'" stating that "by contrast, Plaintiff alleges that Chinese manufacturers receive the alleged discount only if they purchase Qualcomm chips, thus 'earning' the discount." *Id.*

Plaintiff contends that "Qualcomm's royalty discounts are 'secret' because the essential terms of the rebate were not (and are not) known to Plaintiff and the public - especially given that licensees are bound by non-disclosure agreements." *Opposition,* p. 18.  Plaintiff contends that the Complaint need not explain how the alleged discounts were "unearned" because the Complaint alleges that Qualcomm was "secretly extending to certain purchasers special services or privileges not extended to all purchasers upon like terms and conditions." *Id.*

California's UPA states:

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

Cal. Bus. & Prof. Code § 17045.  Section 17045 "prohibits a seller from secretly allowing unearned discounts to a purchaser that injure a competitor and tend to destroy competition." *Fisherman's Wharf Bay Cruise Corp. v. Super. Ct.,* 114 Cal. App. 4th 309, 331 (2003).

Plaintiff alleges that Qualcomm's licensing practices coupled with non-disclosure provisions constitute the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts," which have caused anticompetitive injury.  *Complaint,* ¶¶ 83-84.  However, the Complaint does not allege facts to explain how Qualcomm has secretly allowed unearned discounts to purchasers.  Rather, the facts alleged in the Complaint show that any alleged discounts to purchasers were made public.  The Complaint alleges that "Qualcomm has admitted" that its patent licensing agreements with Chinese cell phone manufacturers "are expressly discriminatory and explicitly linked to those manufacturers' use of Qualcomm chipsets." *Id.,* ¶ 31.  The Complaint further alleges that "Qualcomm publicly summarized" that

the "royalty rates provided to certain Chinese manufacturers for products manufactured and sold in China for use in China are more favorable than [Qualcomm's] standard rates," partly as a result of these manufacturers' commitment to use Qualcomm chips. *Id.*, ¶ 32. As alleged in the Complaint, Qualcomm has publicly announced that it provides discounts to some manufacturers who commit to use Qualcomm chips. The Complaint does not allege facts that support the existence of secret terms that differ from these publicly announced terms. Viewing the allegations in the light most favorable to Plaintiff, the Court concludes that the Complaint fails to allege facts to support a finding that Qualcomm has secretly allowed unearned discounts from its purchasers. The Court dismisses the second claim for violation of California's Unfair Practices Act.

**IV.    Claim for Common Law Monopolization**

Qualcomm contends that California law does not recognize a claim for "common law monopoly." *Mot. to Dismiss,* p. 18. Qualcomm further contends that Plaintiff's "bundled discount theory" fails to "support a monopolization claim" because the Complaint does not and cannot allege that "the discounts result in prices that are below an appropriate measure of the defendant's costs." *Id.* at 8.

Plaintiff contends that California courts do recognize the common law tort of monopolization. Plaintiff asserts that "there is authority supporting the proposition that monopolization is prohibited as against public policy under California common law, and that a business tort of monopolization may be recognized under California law separate and apart from statutory claims arising under the Cartwright Act." *Opposition,* p. 14. Plaintiff contends that the Complaint's allegations with respect to Qualcomm's bundled discount theory are sufficient to state a claim for common law monopolization.

The district court in *In re: Intel Corp. Microprocessor Antitrust Litigation v. Intel Corporation,* 496 F. Supp. 2d 404, 420 (Del. 2007), concluded that a "[c]laim for damages based upon the common law tort of monopolization is not cognizable under California law." Noting that "there is no direct precedent from the California Supreme Court or the California Courts of Appeals on the question of whether California recognizes a common law claim for

damages based upon monopolization," the *Intel* court distinguished the cases relied on by Plaintiff in the Opposition. *Id.* at 419. The *Intel* court stated that neither *Burdell v. Grandi,* 152 Cal. 376 (1907), nor *Exxon Corp. v. Superior Court,* 51 Cal. App. 4th 1672 (1997), "actually analyzes whether a monopolization claim is available under California law in the first instance." *Intel,* 496 F. Supp. 2d at 419. The *Intel* court stated:

> In *Burdell,* the California Supreme Court found that a restrictive covenant in a lease that was intended to create a monopoly was void, but it did not address the availability of damages for a monopoly claim. Similarly, in *Exxon,* the court concluded that the plaintiff's monopoly claim could not survive summary judgment, but did not actually address whether such a claim was cognizable under California law because no such challenge was made to the claim.

*Id.* The *Intel* court acknowledged the that *Natural Gas Anti-Trust Cases I, II, III and IV,* 2002 WL 31570296 (Cal. Super. Ct. Oct. 16, 2002), refused to strike a claim alleging the common law tort of monopolization, but stated that "[m]ore recently," *Branning v. Apple Computer, Inc.*, 1-05-cv-045719 (Cal. Super. Ct. May 9, 2006), concluded that "there is no cause of action for common law monopoly under California law." In holding that a cause of action for common law monopoly was not actionable under California law, the *Branning* and *Intel* courts pointed to the legislative history concerning an attempt in 2002 to amend the Cartwright Act, where the Attorney General of the State of California reported to the Senate that "[a]ccording to the Attorney General's Office, the remedies for illegal monopolization are limited under current law to relief in a federal court." *Intel,* 496 F. Supp. 2d at 419 (quoting Assembly Comm. on Bus. & Profs., 2001-2002 Reg. Session, analysis of Senate Bill 1814, at 3 (June 25, 2002); *Branning,* 1-05-cv-045719; *see also Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir. 1986) (holding that plaintiff's "monopoly arguments fail to state a cognizable claim under California law" because plaintiff's monopoly claim was "not cognizable under the Cartwright Act, for it fails to allege any combination").

The cases cited by Plaintiff to support his assertion that a common law monopolization claim is available under California law do not analyze the issue. In the absence of California Supreme Court law to the contrary, this Court finds the reasoning in *Intel* and *Branning* to be persuasive. The Court finds further support for the conclusion that a claim for common law monopoly is not cognizable under California law in the Ninth Circuit's holding in *Dimidowich,*

803 F.2d at 1478. In light of the foregoing, the Court concludes that Plaintiff may not maintain a monopoly claim based upon California common law. The Court dismisses the fifth claim for common law monopolization.

## V.    Claim for Unjust Enrichment

Qualcomm contends that a cause of action for unjust enrichment does not exist in California. Qualcomm contends that "[r]ather, unjust enrichment is a remedy typically sought in connection with a 'quasi-contractual' claim whereby, in the absence of a valid contract covering the subject matter of the plaintiff's claim, a party can obtain restitution of a benefit unjustly conferred upon the defendant." *Mot. to Dismiss,* p. 25. Qualcomm contends that Plaintiff does not allege any contractual or quasi-contractual relationship with Plaintiff; rather "Plaintiff's only contractual relationship is with his cellular service provider." *Id.*

Plaintiff contends that "California law recognizes that an individual is required to make restitution if he or she is unjustly enriched at the expense of another." *Opposition,* p. 20. Plaintiff contends that the Complaint states a claim for unjust enrichment because "Plaintiff alleges that Defendant is wrongfully in receipt of money, namely profits resulting from supracompetitive prices consumers paid for CDMA-complaint devices, which for considerations of equity and in light of Defendant's alleged conduct, would be unjust for it to retain." *Id.* at 21.

"[T]here is no cause of action in California for unjust enrichment." *Melchior v. New Line Productions, Inc.,* 106 Cal. App. 4th 779, 794 (2003). "The phrase 'Unjust Enrichment' does not describe a theory of recovery, but an effect: the result of a failure to make restitution under circumstances where it is equitable to do so." *Lauriedale Associates, Ltd. v. Wilson,* 7 Cal. App. 4th 1439, 1448 (1992). "Unjust enrichment is a 'general principle, underlying various legal doctrines and remedies,' rather than a remedy itself." *Melchior,* 106 Cal. App. 4th at 784 (quoting *Dinosaur Development, Inc. v. White,* 216 Cal. App. 3d 1310, 1315 (1989)). Unjust enrichment is typically sought in connection with a "quasi-contractual" claim in order to avoid unjustly conferring a benefit upon a defendant where there is no valid contract. *McBride v. Boughton,* 123 Cal. App. 4th 379, 388 (2004).

The Complaint alleges a claim for unjust enrichment, and seeks to recover on grounds that as a result of Qualcomm's anticompetitive conduct, Qualcomm has "benefitted and has been unjustly enriched" at the expense of consumers. *Complaint,* ¶¶ 108-111. However, a cause of action for unjust enrichment is not cognizable under California law. *See Melchior,* 106 Cal. App. 4th at 794. Furthermore, the Complaint does not allege any contractual or quasi-contractual relationship between Plaintiff and Qualcomm. The Court concludes that Plaintiff may not maintain a claim based on unjust enrichment. The sixth claim for unjust enrichment is dismissed.

## VI.   Leave to Amend

Plaintiff requests leave to amend "[s]hould the Court grant Defendant's motion in whole or in part." *Opposition,* p. 21. Plaintiff contends that Qualcomm has not shown that amendment is futile. Qualcomm opposes leave to amend, stating that "[a]lthough Plaintiff's Opposition includes a boilerplate request for leave to amend, any leave would be improper under these circumstances, as the brief fails to identify anything Plaintiff could plausibly allege that would remedy the defects in the Complaint." *Reply,* p. 10.

Rule 15 of the Federal Rules of Civil Procedure mandates that leave to amend "be freely given when justice so requires." Fed. R. Civ. P. 15(a). This policy is applied with "extraordinary liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). Once an answer to the complaint has been filed, as is the case here, courts may deny leave to amend where the proposed amendment would be futile, where it is sought in bad faith, where it will create undue delay, or where "undue prejudice to the opposing party will result." *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973); *see also Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992).

Qualcomm does not assert that amendment is sought in bad faith, will create undue delay, or would prejudice Qualcomm. The Court grants Plaintiff leave to amend.

///

///

///

1

### Conclusion

2        IT IS HEREBY ORDERED that the Motion to Dismiss (Doc. # 15) is **GRANTED.**

3  The above-captioned action is DISMISSED with leave to amend.  Plaintiff may file a first

4  amended complaint within thirty (30) days of the date of this Order.

5  DATED:  March 3, 2009

6

*William Q. Hayes*

                **WILLIAM Q. HAYES**

7                United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28